## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

IN RE:    **DONALD EDWARD MOFFITT, and**        **3:04-bk-22708 E**
           **PHYLLIS JOY MOFFITT, Debtors**          **CHAPTER 13**

**DONALD EDWARD MOFFITT, and**
**PHYLLIS JOY MOFFITT**                     **PLAINTIFFS**

**VS.**                **3:07-ap-01054**

**AMERICA'S SERVICING COMPANY**           **DEFENDANT**

## MEMORANDUM OPINION

On February 28, 2007, Plaintiffs/Debtors (the "**Moffitts**") filed a complaint against Defendant, America's Servicing Company ("**ASC**") and Everhome Mortgage Company ("**Everhome**") for actual and punitive damages pursuant to §§ 105 and 362, 501, 502, 503, 506, 524, 1327 and 1328 of the Bankruptcy Code; Federal Rules of Bankruptcy Procedure 2016, 3001 and 3007; the Court's holding in *In re Edith Smith*, 290 B.R. 102 (Bankr. E.D. Ark. 2004); the Real Estate Settlement and Procedures Act ("**RESPA**"), §§ 2605(e)(1)(B)(2), 2605(e)(2)(C)(1), and 2605(f) of Title 12 of the United States Code; and § 3500.21(e)(3) of Regulation X. By Agreed Order entered December 14, 2007, separate defendant Everhome was dismissed with prejudice. The Moffitts amended their complaint on January 29, 2008, to add claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* and Arkansas state law.

On December 21, 2007, the Moffitts filed a *Motion for Temporary Injunction and Restraining Order* (the "**TRO Motion**") along with a *Certificate of Service* certifying that notice of this motion was provided to all interested parties, including ASC.  In response to the Moffitts' TRO Motion, the Court entered a *Temporary Restraining Order and Order Setting Date for Hearing on Temporary Injunction* on December 26, 2007.  The Court heard the Moffitts' TRO Motion on January 14, 2008 (the "**Injunction Hearing**").  Debra J. Reece and Joel G. Hargis appeared on behalf of the Moffitts, who were also present.  Kimberly D. Burnette appeared on behalf of ASC.  Amy Viers appeared as a representative of ASC. Following the presentation of evidence and testimony of witnesses, the Court granted a temporary injunction against ASC, and subsequently entered its *Order Granting Preliminary Injunction* on January 23, 2008, enjoining ASC from:  (1) contacting the Moffitts except by regular monthly mortgage statements showing only true and accurate information as to what is owed by the Moffitts on their mortgage; and (2) attempting to collect any arrearages, late fees, or any other amounts exceeding the Moffitts' monthly mortgage payments so long as the Moffitts continue to make timely mortgage payments. The injunction is to remain in effect until a trial on the merits of this adversary proceeding is concluded.  The Moffitts were also awarded their attorneys' fees and costs, to be determined by a separate order.

This Memorandum Opinion serves to make findings of fact and conclusions of law based on the evidence taken at the Injunction Hearing.  Pursuant to Federal Rule of Civil Procedure 65(a)(2) (made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7065), " . . . , evidence that is received on the motion and that would

be admissible at trial becomes part of the trial record and need not be repeated at trial."  The Court enters this Memorandum Opinion to document the evidence introduced at the Injunction Hearing, which need not be repeated at trial, and to make findings of fact.  The Court is not entering a judgment on the merits of the Plaintiffs' Complaint.  The Court recognizes that additional evidence may be put on by the parties at the trial on the merits to rebut these findings.  *See University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) (holding that the findings of fact and conclusions of law made by a court granting a preliminary injunction are not generally binding at trial on the merits).

## NARRATIVE SUMMARY

This opinion is about the Moffitts, an older couple, who lived in a home valued at $31,500 by their mortgage creditor, ASC.  The Moffitts filed a chapter 13 bankruptcy on October 22, 2004.  Their chapter 13 plan provided that their mortgage arrearage would be brought current over a period of five years.  Prior to filing bankruptcy, Mrs. Moffitt (who was employed at a law firm) was hit by a truck, and filed a personal injury lawsuit.  When the lawsuit settlement funds were received, the Moffitts used the funds to pay off their five-year chapter 13 plan more than three years early.  The Chapter 13 Trustee made final disbursements to ASC totaling $9,581.57; an Order was entered directing the Moffitts to make their regular monthly mortgage payments directly to ASC (which they did); and the Moffitts received a Discharge.  The Moffitts also used their settlement funds to send a $10,000 check to ASC with written instructions to apply the payment to principal.  Because

3

the Trustee's final disbursement should have brought the Moffitts' home loan current (paying all allowed fees and costs and catching up prior mortgage payments), the $10,000 should have been applied to principal, the regular monthly mortgage payments should have been routinely applied to principal, interest, and escrow, and the Moffitts should have had no trouble with ASC.  This is not what happened.  Instead, ASC misapplied these payments, failed to record the correct information even though Mrs. Moffitt constantly called and talked to ASC's agents, failed to follow her written instructions, failed to communicate with the Moffitts, sent mortgage statements that were incomprehensible and frightening, began collection calls, and engaged in a litany of mismanagement of the Moffitts' loan which led the Moffitts to reopen their bankruptcy case and file a lawsuit against ASC, and ultimately to file for a temporary injunction against ASC asking the Court to enter an Order directing ASC to stop calling them and to send only regular accurate mortgage statements to them. The Court granted this injunction.  This Opinion will explain why the injunction was entered, what happened to the Moffitts, and what happened to the money they paid ASC.  At times, the explanations are complex; as an aid to reading the Opinion, the Court begins with a brief factual overview and attaches an appendix which includes a summary of the statements ASC sent to the Moffitts.

4

## FACTUAL OVERVIEW

The Moffitts received a chapter 13 discharge on April 6, 2006.[1] Prior to the discharge being entered, the Court entered an Order dated March 27, 2006, stating that ASC's claim had been paid in full, and the Moffitts were to begin making their monthly mortgage payments directly to ASC.[2] The same day, the Moffitts paid their mortgage creditor, ASC, an additional $10,000 with written directions that it be applied to principal. Around the same time, the chapter 13 Trustee (the "**Trustee**") made final disbursements to ASC totaling $9,581.57. Without communicating with the Moffitts, ASC recorded the $10,000 payment first, and rather than applying it to the Moffitts' mortgage principal, used it to catch up the Moffitts' arrearage, pay fees, and pay the Moffitts' mortgage ahead a few months. ASC recorded the Trustee payments later that month, using part of it to pay the mortgage ahead a few more months, and put the rest into something called "Trustee Suspense." Mrs. Moffitt wrote ASC on April 20, 2006, and again on July 13, 2006, to correct the application of the $10,000, and then called ASC constantly in an effort to sort out the discrepancies and to determine what had happened to the $10,000 principal payment.

Finally, in June 2006, ASC reversed all the applications of the $10,000, the Trustee

---

[1]The Moffitts had previously filed a chapter 13 bankruptcy on June 27, 2000, which was later converted to a chapter 7 in June 2004; they received a chapter 7 discharge on August 26, 2004.

[2]Everhome was the mortgage servicer when the Moffitts filed bankruptcy; the loan was later transferred to ASC. Additionally, according to ASC's representative appearing at the TRO hearing, ASC is a fictitious name for Wells Fargo Bank and not a separate legal entity. ASC's representative testified that ASC was created to distinguish between the loans that Wells Fargo services for clients and those that it services on its own behalf.

payments, and the Moffitts' regular payments for April, May, June and July.   ASC subsequently applied the $10,000 to principal, and reapplied the Trustee payments and the Moffitts' April, May and June payments; ASC failed to reapply the July payment.   When ASC made the reversals and reapplications, it incorrectly overpaid 14 out of the 18 mortgage payments it reapplied, which resulted in a portion of the July payment remaining in a "suspense" category.   ASC then showed the Moffitts due for their July mortgage payment in its internal payment history.   Consequently, ASC began to apply every mortgage statement that it received from the Moffitts to the payment due for the prior month, and the Moffitts began getting two statements per month showing them behind and assessing late fees. Though tremendously upset and confused, the Moffitts continued to make their regular monthly mortgage payments.

Because the Moffitts' many attempts to resolve their mortgage issues with ASC (including writing three letters and repeatedly calling ASC) were unsuccessful, the Moffitts reopened their bankruptcy case on July 31, 2006.   The Moffitts subsequently made a Qualified Written Request[3] upon ASC, and ASC responded in December 2006 by providing

---

[3]A "qualified written request" under the Real Estate Settlement Procedures Act is defined in 12 U.S.C. § 2605(e)(1)(B) as:

> . . . a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that–
>
> > **(i)** includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> >
> > **(ii)** includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

the Moffitts with a payment transaction history on the Moffitts' mortgage (the "**Initial Payment History**") and a loan pay-off letter. The Moffitts filed their complaint against ASC on February 28, 2007. The complaint alleged that ASC's predecessor, Everhome, had charged unlawful fees and costs to the Moffitts' mortgage. The complaint also alleged that ASC had misapplied the Trustee payments, the Moffitts' $10,000 payment, and the Moffitts' pre- and post-petition payments. The Moffitts also alleged in their complaint that they began receiving two mortgage statements per month in August 2006 with varying principal balances.

In August 2007, more than a year after ASC failed to credit the Moffitts' July 2006 payment, ASC sent the Moffitts a letter informing them that there was a sum of money held by ASC that did not equal a full mortgage payment, and requesting that the Moffitts remit the difference between that sum and a full mortgage payment. The Moffitts did not understand the letter because they had made all their monthly mortgage payments since getting out of bankruptcy. Later in August 2007, ASC began phoning the Moffitts and leaving messages for them. On August 22, 2007, ASC ordered an appraisal called a "broker's price opinion," a step taken when an account is 30 days delinquent. The Moffitts received another phone message from ASC on October 24, 2007, which they recorded.

On December 21, 2007, the Moffitts filed the TRO Motion alleging that ASC, through the August 2007 letter, phone messages, and mortgage statements, was attempting to collect late charges and arrearages that the Moffitts did not owe, despite the Moffitts' representation by counsel in an ongoing adversary proceeding filed by the Moffitts against ASC. The TRO

7

Motion sought to enjoin ASC from contacting the Moffitts until a trial on the merits of the Moffitts' Complaint could be held and decided. When ASC's counsel was asked by the Court at the Injunction Hearing why it would not agree to a temporary restraining order prohibiting ASC from calling the Moffitts until a trial could be held in this matter, ASC's counsel responded:

> Your Honor, the company can agree to that. The problem is, you know, I have discussed that with my witness, you can never guarantee anything a hundred percent. And I just – we talked about different ways to do it, but the – you know, the evidence, you know, will show there actually was a stop calls put on this loan. The plaintiffs have that information. I've given it to them. They're aware of that.
>
> There was still a call that was made after that went on there. So that's what I'm so afraid of. And that's what ASC is so afraid of, is that if this restraining order is entered and something happens, a statement goes out with unapplied funds on it or a late charge or another call is made, that we will be hit much, much harder without the information that we want to give the Court today and if the entire information that the debtors gave in their motion is accepted by the Court. We were just unable to accept that the way it was given.

ASC's representative had been working on the Moffitts's account since late 2006 or early 2007, before the Moffitts filed their Complaint in February 2007. Yet, ASC's representative testified at the Injunction Hearing that until the TRO Motion was filed she did not realize the Moffitts' funds had been misapplied and that the Moffitts were not actually one month behind in their monthly mortgage payments. ASC's representative also testified that the Moffitts bore some responsibility in seeing that ASC applied their payments correctly (despite the Moffitts having notated on every check memo line which month's payment they were making).

8

ASC also acknowledged at the Injunction hearing that the transaction history it provided the Moffitts in December 2006 as a response to the Qualified Written Request was inaccurate in some respects.[4]  The Friday before the Injunction Hearing, ASC provided the Moffitts with a new payment history that corrected certain transactions (although it is not clear whether ASC pointed these corrections out to the Moffitts or not).  The Court refers to this history as the "**Revised Payment History**."  The allocations or transactions made by ASC and described in this Opinion are taken from the payment histories provided by ASC. Unless otherwise noted, both the Initial Payment History and Revised Payment History show the same transactions through December 2006 (only the Revised Payment History records transactions beyond December 2006).

## FINDINGS OF FACT

These factual findings are drawn from the record of the TRO hearing, including testimony and exhibits.  Several exhibits require brief descriptions here and will be referred to throughout the Court's findings of fact.  Except where otherwise noted, the Court accepts the documentary evidence and testimony as facts.

---

[4]A Qualified Written Request places an obligation on the servicer to review their records and provide an accurate transaction history.  *See* 12 U.S.C. § 2605(e)(2) (requiring a mortgage servicer upon receipt of a Qualified Written Request to conduct an investigation with respect to the borrower's account, make corrections if necessary, and provide the borrower with a written explanation or clarification as to why the servicer believes the account information is correct). *See also In re Payne,* ___ B.R. ___, 2008 WL 1961489 (Bankr. D. Kan. 2008).

## The Moffitts' Mortgage Payments

Plaintiffs' Exhibit 1 is comprised of a copy of the Moffitts' cleared checks and deposits from March 24, 2006, through September 18, 2006, and a bank account history from September 18, 2006, through January 11, 2008.  This exhibit illustrates that the Moffitts made monthly mortgage payments to ASC each month between April 2006 and January 2008.  The Court finds the payments made by the Moffitts, as listed on Appendix A attached to this Opinion, accurately reflect the payments made by the Moffitts on their mortgage.

## Mortgage Statements

The Moffitts received 38 mortgage statements between April 2006 and December 2007 (a 21 month time period), and those statements were introduced as Plaintiffs' Exhibit 5.  The Court finds that the statements presented incomplete, inaccurate, and incomprehensible information; some are described in detail in this Opinion to document the information that the Moffitts had been receiving about their mortgage.  Copies of the first statement and last statement are attached to this Opinion as Appendix B.  Further, tables reflecting the information on all 38 statements are attached to this Opinion as Appendix C. The Court prepared the tables' form for the purpose of reader convenience.  Because each table contains the ***exact*** information provided in the ASC statements, they are at times confusing and difficult to follow.   The statements are numbered for reference in chronological order according to the "principal balance as of" date, which is probably the date the statement was generated, according to ASC's representative, Amy Viers.  (There was no evidence as to when the statements were actually received, and Ms. Viers could not

10

say for sure when the statements were generated, but believed the "principal balance as of date" was probably when they were generated.)  Ms. Viers testified that a statement is generated whenever a payment is received or late charges assessed.

### March 27, 2006 through July 31, 2006:
### The First Four Months Post-Discharge

On March 27, 2006, the Court entered an Order directing the Moffitts to make their regular monthly mortgage payments directly to ASC beginning April 1, 2006.  The March 27, 2006 Order also stated that ASC had been paid $14,409.13, the full amount of its claim. Upon request at the Injunction Hearing, the Court took judicial notice of the March 27, 2006 Order.[5]  The Court also takes judicial notice that the March 27, 2008 Order was sent to ASC's Bankruptcy Department, X7801-014, 3476 Stateview Boulevard, Fort Mill, SC 29715, as reflected on the Order.  Also, Mrs. Moffitt faxed a copy of this Order to ASC.  She testified that on March 30, 2006, she called ASC, got a fax number, and then faxed ASC a letter with the copy of the March 27, 2006 Order attached.  A copy of Mrs. Moffitt's fax and confirmation of receipt was admitted as Plaintiffs' Exhibit 2.  The purpose of the letter was to give written instructions concerning application of a $10,000 check she was mailing and to inquire about an escrow overage.  Her  faxed letter reads as follows:

> Per our phone conversation yesterday, I am sending you a copy of the Order issued by Judge Audrey Evans of the United [sic] Bankruptcy Court Eastern

---

[5]The Court takes judicial notice of the case docket and all documents filed in a bankruptcy case.  *See* Fed. R. Evid. 201; *In re Henderson*, 197 B.R. 147, 156 (Bankr. N.D. Ala. 1996) ("The court may take judicial notice of its own orders and of records in a case before the court, and of documents filed in another court.") (citations omitted); *see also In re Penny*, 243 B.R. 720, 723 n.2 (Bankr. W.D. Ark. 2000).

& Western District of Arkansas, showing that our arrearage has now been paid in full.

From what I read, I assume that we will be sent a statement for the April payment that is due on our home sometime this month, I understand that it is due on the 1st, but we did not receive the order until yesterday. I will be sending a payment today for the April statement and will simply put our loan # on the check and indicate that it is for the April payment. I also sent out a check yesterday for $10,000.00 to be paid directly to the principal and expect to be sending another check within 2 months to pay our balance in full.

I am also enclosing a copy of a letter that we received showing that we had an escrow overage of $2747.28. I called on 2/22/2006 to find out about this and was told that as soon as our arrearage had been paid that we would be issued a check for this overage. Our arrearage has now been paid and we were wondering when we might expect the check for the overage?

Mrs. Moffitt testified that she made this $10,000 payment on principal in an effort to pay her home mortgage down as quickly as possible since she had become disabled as a result of the accident. She also noted on the check memo line "to be pd to principal." The check Mrs. Moffitt sent for her April payment also noted on the memo line that it was for that month's payment, as did all checks that Mrs. Moffitt sent to ASC.

The Trustee filed a *Certification of Final Payment and Application for Issuance of Order of Discharge* ("**Certification of Final Payment**") on April 5, 2006, and the Moffitts received a Chapter 13 discharge on April 6, 2006.[6] The Bankruptcy Noticing Center sent ASC a copy of the discharge order on April 8, 2006. The Moffitts also faxed ASC a copy of their discharge order on April 20, 2006, with a letter that once again noted their arrearage had been paid in full, that their April payment had been made and cleared their bank, and that

---

[6]The case was closed on June 7, 2006.

12

they had made a $10,000 principal payment that had also cleared their bank.   Mrs. Moffitt

inquired again about their escrow overage.  A copy of Mrs. Moffitt's fax and confirmation

of receipt was admitted as Plaintiffs' Exhibit 3, and her faxed letter reads as follows:

> I am sending you a copy of our discharge from Chapter 13 bankruptcy.  Our
> arrearage has been paid and our mortgage is now current.  I also sent a check
> #2606 for our April payment and a check #2604 for $10,000.00 to be paid on
> the principal.  Both of these checks have already been paid according to our
> bank.
>
> Our question is according to the letter that we received from ASC (I am
> sending a copy of the letter along with this fax) we have an overage of
> $2747.28 in our escrow account and were told that we would receive a check
> for this amount.  Can you please let us know when we might expect to receive
> this check?

Mrs. Moffitt testified that she sent this fax to ASC because ASC "kept saying that [the

Moffitts] were not discharged from bankruptcy."  Mrs. Moffitt testified that ASC did not

contact her about the overage, and also failed to apply the $10,000 check to principal.  Mrs.

Moffitt testified that she had called ASC repeatedly about applying the $10,000 to principal

and ASC would not do it.  The Court finds Mrs. Moffitt's testimony credible and accepts it

as fact.

Ms. Viers testified that the $10,000 payment was not initially applied to the Moffitts'

principal balance because the loan was delinquent at the time, and the mortgage dictated that

payments first be applied to escrow, then interest, then amortized principal and interest.

Although the March 27, 2006 Order stated that ASC had been paid in full (and therefore, the

Moffitts' mortgage should not have been delinquent), and although the Trustee had already

filed a Certification of Final Payment on April 5, 2006, ASC did not record the final trustee

13

payments of $1,045.78 and $8,535.79 until April 26, 2006, according to its payment histories.  No evidence was submitted to explain why there would be a delay between the Trustee's Certification of Final Payment, and ASC's recording the payments as received.

Despite the Moffitts' discharge, their mortgage statements continued to show them as being in bankruptcy. Specifically, statements 1 (generated April 3, 2006) through 31 (generated August 1, 2007) all included the following:

> **Important Messages**
> *This statement is for informational purposes only.  Our records indicate that your loan is protected by a bankruptcy plan.  The attached coupon reflects the calendar due date, not the contractual due date of the bankruptcy plan.  If you have any questions regarding your loan, please contact your bankruptcy attorney or our office.*

Although ASC had received the Moffitts' $10,000 principal payment, $9,581.57 in Trustee payments, and three regular mortgage payments of $332.46 each between March 27, 2006, and May 31, 2006 (a total of $20,578.95), the first five statements the Moffitts received (dated between April 3, 2006, and May 31, 2006)  show a total reduction in principal of only $863.58.  Statement 1, generated on April 3, 2006, showed a principal reduction of $418.43, a payment of $782.28 with no explanation as to how it was applied, and two regular mortgage payments received on April 3, 2006.  Statement 2, generated on April 26, 2006, showed ASC's receipt of the Trustee payments of $8,535.79 and $1,045.78, with three regular mortgage payments applied.  Statement 3, generated on May 3, 2006, showed one application of a regular mortgage payment on May 3, 2006.  Statement 4, generated on May 16, 2006, showed that two regular mortgage payments were applied on May 16, 2006.

14

Statement 5, generated on May 31, 2006, showed the application of four regular mortgage payments. The "next payment" indicated on each of these statements ranges from the May 1, 2006, to September 1, 2007. None of these statements reflect that ASC received or applied the Moffitts' $10,000 payment. (See tables representing statements in Appendix C.)

After the Moffitts received statement 5 generated on May 31, 2006, stating that their next payment was due September 2007, they received another statement generated June 30, 2006, stating that payment in the amount of $5,984.28 was due on July 1, 2006 (the next day!). Statement 6 also showed three payment reversals and the application of the Moffitts' July mortgage payment on June 30, 2006.

In the midst of the transactions described above, Sybil Plover with ASC instructed Mrs. Moffitt to write a letter stating that she wanted the $10,000 applied to principal. Although Mrs. Moffitt had already faxed written requests on March 30, 2006, and April 20, 2006, neither of which was acknowledged by ASC, she wrote another letter on July 13, 2006, as instructed. Mrs. Moffitt's letter to that effect dated July 13, 2006, was admitted as Plaintiffs' Exhibit 4. The tone of this letter reflects her justified frustration and reads, in its entirety, as follows:

> I am writing this letter per a request I received today asking me to state in letter form that the check #2604, written on March 27, 2006, for $10,000.00 on my personal account, to Americas Servicing Company, for account #1172006772, was to be paid to principal only as I indicated on the check.
>
> This request is one of the most ludicrous things that I have been asked to do in a very long time. Not only did I indicate on the check that this was to be paid to principal only, indicated on the payment coupon that this was to be paid to principal only, I have called Americas Servicing Company about this

matter once a week every week since this check was written. Americas Servicing Company as far back as April had informed me that my personal check had been used to pay off my arrearage and paid me ahead several months in payments. This mortgage company informed me in April that they had taken the check that the Bankruptcy Court sent them for $8584.19, along with all the house payments that I have made every month and put them into suspense. They have also repeatedly assured me that they would take the check sent by the Bankruptcy Court along with the payments that they had put me ahead and pay the $10,000.00 to my principal as they should have done in the first place.

I have also been repeatedly reassured that my loan was now out of bankruptcy until two weeks ago when I asked why we had not received the check for $2747.28 in surplus escrow, that we had requested be sent to us. I was told then that the bankruptcy department would not release it because there was something still in dispute. Although I have spoken to someone at Americas Servicing Company every week since March, this was the first time that I had heard anything about a dispute, and quite oddly no one could or would tell me what the dispute was about.

Now this request for a letter stating that the check that I sent back in March be paid to principal. I do not know what is going on with this or why Americas Servicing Company seems to be continually stalling us, but I have had more than enough. Not only is this extremely frustrating and physically debilitating, it borders on the criminally reprehensible. This mortgage company is setting [sic] on almost $22,000.00 of my money and as you can see from the statements that I am sending with this letter I only owe $28,589.36 in principal on my home.

Now this is not a threat, but a statement. They have had almost four months to get this matter straightened out and taken care of. I think that I have been more than patient, but my patience has now come to an end. If this matter is not taken care of by the early part of next week, I will send a copy of this letter to Judge Evans at the bankruptcy court, to anyone else that I can think that will listen to me, see what legal options are available to me of reopening my case, and if there is any legal recourse of suing Americas Servicing Company for their apparent negligence.

Mrs. Moffitt testified that in addition to writing ASC, she called ASC almost every day, and

would get different stories from every person she talked to. Mrs. Moffitt explained that ASC

16

had told her at one point that ASC had taken her $10,000 principal payment and paid the bankruptcy claim, then put her some payments ahead, and then took the bankruptcy court checks and put them into a suspense account. Mrs. Moffitt explained that she believed that ASC somehow got her a payment behind when they tried to undo their mistake in not applying the $10,000 payment to principal.

Mrs. Moffitt testified that she and her friend and former co-worker Rhonda Jones, a paralegal with the Dickerson Law Firm, continued to call ASC about the matter on Mrs. Moffitts' behalf until Mrs. Moffitt reopened her bankruptcy case. Ms. Jones testified that even though the Moffitts had received a discharge, ASC was still showing them in bankruptcy, and had put the Trustee payments in suspense. Ms. Jones testified that she probably called ASC every other day for a while in 2006, and she believes they began to screen her calls. Ms. Jones explained that she kept asking to speak to Sybil because she was the person she had talked to before, but Sybil would not be there and would not call her back. Ms. Jones ultimately recommended that Mrs. Moffitt hire an attorney to reopen her bankruptcy case and seek relief through the Bankruptcy Court.

On July 21, 2006, ASC generated statement 7 which showed the application of four mortgage payments. Although there were insufficient payments to explain a reduction in principal, and although the $10,000 applied to principal was never reflected on a statement, the principal balance on statement 7 was more than $12,000 less than shown on statement 6 (see Table 7 on Appendix C). However, this same statement which reflected the large principal reduction also informed the Moffitts that on July 21, 2006, they were a payment

17

behind and $664.92 was due on August 1, 2006. From March 27, 2006, to July 31, 2006, ASC did not send the Moffitts a statement which accurately accounted for the funds ASC received from the Moffitts. Further, beginning with statement 7 generated on July 21, 2006, ASC began generating two statements per month, with the first statement showing the Moffitts a month behind and assessing a late fee. Then, the next statement reflects that the missed payment has been made, applies the missed payment to principal, interest, and escrow, and continues to accrue the late fee on top of the late fees already assessed.

The Moffitts reopened their bankruptcy case July 31, 2006.

**August 1, 2006 through February 28, 2007**:
**The Next Seven Months**

ASC's pattern of sending two statements per month, continually showing the Moffitts one month behind, and assessing late fees continued until the TRO hearing (a period of 18 months).

During the Fall of 2006, the Moffitts sent ASC a Qualified Written Request. ASC replied by a letter dated December 12, 2006 (Plaintiffs Exhibit 11), in which ASC informed the Moffitts' counsel that it was enclosing a Customer Account Activity Statement outlining the transaction history on their loan from May 1, 1999, to the present date, enclosing a copy of the Moffitts' mortgage document allowing for the charging of fees to the loan, and enclosing a payoff statement for the loan. The letter also states that any other information requested and not provided is privileged information that cannot be released. The Customer Account Activity Statement is actually a replica of a payment transaction history on the

18

Moffitts' mortgage that covered transactions from October 2004 (not May 1, 1999) through December 2006 (the "**Initial Payment History**"). This history was admitted into evidence as Plaintiffs' Exhibit 9. Ms. Viers testified that she did not personally prepare the Initial Payment History, but that it was manually prepared based on the information in ASC's automated computer system to put the information into a more user friendly format. Ms. Viers stated that a line item entry is made on the history whenever any payment on the mortgage comes in, or anything is assessed against the mortgage or removed from it for any reason.

The Initial Payment History shows that despite Mrs. Moffitt's instructions, ASC allocated the Moffitts' $10,000 principal payment to 15 mortgage payments totaling $4,894.78 (14 payments of $325.88 and one payment of $332.46 representing the March 2006 payment), a $13.04 late fee, and $4,782.24 in corporate fees[7] on April 3, 2006. After these allocations, $309.94 remained and was placed into "Debtor Suspense" and was later applied to principal along with a pre-existing amount in Debtor Suspense of $108.49 for a total principal reduction of $418.43. The Initial Payment History also provided the following information:

On April 3, 2006, ASC applied the Moffitts' April 2006 mortgage payment to principal, interest and escrow.

On April 26, 2006, ASC applied the first Trustee payment of $1,045.78 to three

---

[7]Ms. Viers testified that these fees represented foreclosure related fees that were assessed while Everhome serviced the mortgage.

mortgage payments, and put the remaining $48.40 in Debtor Suspense.  ASC initially put the $8,535.79 Trustee payment in "Trustee Suspense."

On May 3, 2006, ASC applied the Moffitts' regular mortgage payment for May to principal, interest, and escrow.

On May 16, 2006, $4,768.56 of the $8,535.79 Trustee payment was applied to corporate fees; $677.56 was applied to two mortgage payments.

On May 31, 2006, ASC applied the Moffitts' regular mortgage payment for June to principal, interest, and escrow.  The same day, $3,049.02 of the $8,535.79 Trustee payment was applied to nine mortgage payments, and the remaining $40.65 was added to Debtor Suspense.  The application of the trustee funds and the Moffitts' regular mortgage payments (in addition to the $10,000 previously applied) paid the Moffitts' mortgage forward through August 2007.

On June 26, 2006, ASC reversed every payment applied since April 3, 2006.  ASC reversed a total of 32 mortgage payments (a total of $10,616.12 consisting of 16 payments at $332.46; 14 payments at $325.88; one payment of $389.34; and one payment of $345.10), and the principal payment of $418.43 (out of Debtor Suspense).  ASC placed all of these monies in Debtor Suspense.

Meanwhile, on June 23, 2006, the Moffitts made their regular July monthly mortgage payment which cleared their bank account on July 3, 2006.  On the Initial Payment History, this payment is shown as received on June 30, 2006, and placed into Debtor Suspense rather than being applied as a regular monthly mortgage payment.

20

On July 7, 2006, ASC reversed the $4,782.24 corporate fee and recorded a $15 property inspection fee.

On July 18, 2006, ASC applied $10,000 to principal.

On July 21, 2006, $5,984.28 was applied to 18 mortgage payments ($332.46 each) covering January 2005 through June 2006. Upon review of the Initial Payment History, the Court found that when the mortgage payments were reapplied, they should have been applied as 14 mortgage payments of $325.88, and four payments of $332.46 for March through June of 2006, totaling $5,892.16 (as they had originally been applied). But by applying 18 payments of $332.46 (totaling $5,984.38) instead, ASC applied $92.12 of the Moffitts' July payment to prior payments leaving the Moffitts' with approximately $240 (out of their July 2006 $332.46 payment) sitting in suspense. According to Ms. Viers' testimony, ASC does not apply funds to a mortgage payment unless there is enough for a complete mortgage payment. Accordingly, when correcting the application of the Moffitts' $10,000 principal payment and the Trustee payments, ASC overpaid 14 prior mortgage payments thereby dipping into the Moffitts' regular July mortgage payment and leaving insufficient funds to make that payment. ASC failed to recognize its mistake and began showing the Moffitts one month behind, as described above.[8]

On July 24, 2006, ASC reversed the $13.04 late fee, and ASC refunded the Moffitts

---

[8] Despite the Moffitts making a Qualified Written Request, filing a lawsuit, and a motion for a TRO, ASC did not find its error. ASC's application of 14 payments at $332.46 instead of $325.88 was not mentioned during the Injunction Hearing. The Court found this error by examining the payment histories.

$3,011.87 for an escrow overage. The following day, July 25, 2006, ASC assessed another late fee of $13.04.  When the Moffitts made their August mortgage payment on July 31, 2006, ASC applied it to the payment due for July.  Statement 8 was generated July 31, 2006, showing the application of the payment received on July 31, 2006, the assessment of a late fee, the escrow refund, and the reversal of a previous late fee.  The Initial Payment History shows that from this point forward, ASC continued to apply the Moffitts' monthly mortgage payments to the payment due for the prior month, continued to assess late fees, and periodically reversed late fees.[9]

In addition to the Initial Payment History provided to the Moffitts in December 2006 (in response to the Moffitts' Qualified Written Request), ASC provided the Moffitts with a loan payoff letter dated December 12, 2006, introduced as Plaintiffs' Exhibit 11, along with a loan payoff statement, introduced as Plaintiffs' Exhibit 12.  According to the loan payoff statement, the amount necessary to pay the Moffitts' mortgage loan in full through January 10, 2007, included:  the principal balance due on the loan at $16,996.38, interest due of $291.00, recording fees of $8.00, an inspection fee of $15.00, and attorney fees of $600.[10]

---

[9]Ms. Viers testified that ASC periodically reversed late fees to give the Moffitts the benefit of the doubt because they were in an adversarial relationship with ASC.  Until the Injunction Hearing, ASC did not acknowledge that the fees were charged in error because the Moffitts were not in fact *late* in making payments.

[10]According to Ms. Viers, the recording fee is for releasing the lien in the event the loan was paid off.  Ms. Viers was not sure what the attorney fees charge was for, because she did not believe ASC charged attorney fees when a person paid off their loan.  Ms. Viers did not think any fees were due and owing at that time, so that the attorney fees charge would not be legitimate.

The Moffitts filed their complaint against ASC on February 28, 2007.

### August 2007 through December 2007:
### ASC's Collection Efforts

Almost six months after filing suit against ASC and as ASC continued to send the Moffitts two statements per month consistently showing them behind and assessing late fees, the Moffitts received a letter from ASC dated August 16, 2007 (admitted as Plaintiffs' Exhibit 6), which stated:

> Our records reflect funds in the amount of 243.16 exists in an unapplied account on your mortgage loan. Your monthly mortgage payment is 317.84, therefore an additional 74.68 is required to make a complete payment. Please remit the difference of 74.68 to the following address.

Mrs. Moffitt testified that she had no idea where the amounts referenced had come from, and that she had not made a payment of $243.16.[11]

Mrs. Moffitt testified that she also received a number of phone messages from ASC left on her answering machine. Mrs. Moffitt testified that she received a message from ASC on October 24, 2007, and phoned her attorney Joel Hargis and played the message to him so that it would be on his recording machine. The message stated:

> [Indiscernible]. Hello, this message is for Donald Edward Moffitt. This is Samantha with America Servicing Company. It's very important that we do receive a call back from you. We're here until 9:00 p.m. Eastern Standard Time today. Our toll free number is 888-828-2377. And we do expect to hear from you today. Thank you.

---

[11]The Revised Payment History (which was not provided to the Moffitts until the Friday before the Injunction Hearing) shows that this amount was computed by adding together $133 in Debtor Suspense and $100.16 in Trustee Suspense. These amounts would be what was left over from the unapplied July 2006 payment after ASC incorrectly reapplied 18 mortgage payments at $332.46 each, instead of 14 payments of $325.88 and four payments of $332.46.

A tape of this message was accepted into evidence with no objection from ASC, and a transcript of the recording was admitted as Plaintiffs' Exhibit 7.  Mrs. Moffitt testified that it was the last message she received from ASC before the TRO hearing.

In the meantime, the Moffitts received eight mortgage statements generated between August 2007 and December 2007.  After sending the Moffitts 31 statements showing them to be in bankruptcy when they were not, the format of ASC's statements finally changed with statement number 32 generated on August 31, 2007.[12]  The "Important Message" regarding their loan being protected by a bankruptcy plan is removed, and instead of "Next Payment" followed by a date, the statements clearly state when the next payment is due and identifies "overdue payment(s)" and "unpaid late charge(s)."

Statement 37 inexplicably shows two payments due in December 2007; the current month's payment is dated 12/01/07, and the payment listed as overdue is also dated 12/01/07, for a total of $638.50 due on December 1, 2007.[13]  Statement numbers 33 and 38 contained the following message:

> ***Your monthly mortgage payment has not been received.  Please make your payment immediately.***

---

[12]It took ASC over 17 months to change the Moffitts' loan from one in bankruptcy to one out of bankruptcy despite receipt of the Court's order directing the Moffitts to pay ASC directly, notice of the Moffitts' Discharge (sent by both the Court and the Moffitts), and two faxed letters from Mrs. Moffitt informing ASC of their discharge.

[13]With respect to the two payments due in December 2007 as reflected on statement 37, Ms. Viers testified that she had no explanation for why that statement showed an overdue payment due for December 2007 and a current payment due for December 2007.

## December 2007: TRO Motion Filed & ASC Discovers its Mistake

The Moffitts filed the TRO Motion on December 21, 2007. Although the Moffitts' account had been assigned to Ms. Viers' department since at least February 2007 (when the Moffitts sued ASC), Ms. Viers did not begin work on the Moffitts' loan until August 2007. Further, despite having worked on the Moffitts' account since August 2007, Ms. Viers testified that she did not become aware that there was a discrepancy in the Moffitts' payments, and that the Moffitts believed they were current in their payments, until the middle of December 2007 when the Moffitts sought a temporary restraining order. Ms. Viers explained that she understood the Moffitts' lawsuit (filed in February 2007) to be about a misapplication of the $10,000 the Moffitts had paid on principal, a misapplication of the Trustee funds that had been applied to suspense accounts, and some fees that had been charged to the Moffitts' mortgage account. When questioned about why it took the motion for a temporary restraining order to get ASC to figure out what had gone wrong with the Moffitts' account, Ms. Viers testified

> I have no record that we ever were shown a payment – this payment discrepancy, that it was ever put out in black and white really what was going on. And that – and we were never provided even proof of payments to show that all the payments were made in accordance with the order until today. The TRO, like I said, just brought to light that there was a payment discrepancy and made obvious that they felt that they should be current and not be charged the late fees.

After the Moffitts' counsel pointed out that ASC had already created the Initial Payment History (in December 2006) which showed the July 2006 payment going into suspense and not being applied as a regular mortgage payment, Ms. Viers stated, "[i]n looking at this, it's

25

not clear the intentions of the payments and how the mortgagors intended for those to be applied." Ms. Viers was asked how this could be so when Mrs. Moffitt sent her payment in with a payment coupon and also noted on her check's memo line that the payment was for her "July payment." Ms. Viers said:

> Actually that's – and I understand – and that's actually commonplace. A lot of times people will just send in their most recent coupon with their payment, and that's not necessarily where it's intended to be applied.

Ms. Reece asked Ms. Viers:

> So ASC doesn't train their people to look on their memo section of the check and the payment coupon to see what date this is supposed to be applied?

Ms. Viers responded:

> And those aren't always accurate. Those could be a misunderstanding, there could be a check that was never received. There are a lot of issues that could go into play.

Ms. Viers testified that it would have been very difficult for an ASC employee to figure out what had happened to the Moffitts' June 2006 payment. However, she acknowledged that "team lead" or supervisor was already working on the Moffitts' account doing the reversals and would have had the necessary knowledge and experience to find the problem. Ms. Viers also stated that she believed the Moffitts had "some responsibility in seeing that we applied [their payments] in accordance with her wishes, and to bring them to our attention if it's not."

### January 2008:  The Revised Payment History,
### Communications Record, and Injunction Hearing

On the Friday before the Injunction Hearing held the following Monday, ASC provided the Moffitts with the Revised Payment History. The Revised Payment History

26

revised some entries on the Initial Payment History and added transactions occurring between December 2006 (when the Initial Payment History had been created) and January 2008. The Revised Payment History does not reflect that corrections were made to it.

Unlike the Initial Payment History, the Revised Payment History shows the June 30, 2006 mortgage payment initially applied as a regular mortgage payment but then reversed and put in Debtor Suspense on July 5, 2006. Ms. Viers testified that based on the servicing histories she reviewed, this is what she believes actually happened, but that the initial application of the mortgage payment was not manually entered into the Initial Payment History. Ms. Viers recalled correcting the Initial Payment History to make this correction. She acknowledged that whichever is correct, the payment did end up in Debtor Suspense and was never removed.[14] Ms. Viers said that she believed the payment was improperly applied because ASC was in the midst of reversing all the mortgage payments it had previously applied. Ms. Viers explained that the reversal process was lengthy and complicated because ASC had to manually reverse each payment, and that ASC was limited to doing only a certain number of transactions per day on a loan.

The Revised Payment History also reflected that the corporate fees of $4,768.56 recorded on May 16, 2006, was broken into three assessments of $758.25, $3,110.31, and $900.00. Additionally, according to the Initial Payment History, ASC took $3,089.67 out

---

[14]A review of the Revised Payment History reflects that only $130.33 of the Moffitts' July 2006 mortgage payment ultimately remained in Debtor suspense while $110.16 remained in Trustee Suspense. The Initial Payment History showed $240.49 remaining in Debtor Suspense, and $0 in Trustee Suspense.

of Trustee Suspense and applied $3,049.02 of it to nine mortgage payments on May 31, 2006, and added the remaining $40.65 to Debtor Suspense. The Revised Payment History shows $3,049.02 coming out of Trustee Suspense leaving a balance of $40.65 in Trustee Suspense with no money added to Debtor Suspense. The Revised Payment History also shows the reapplication of $5,984.28 to the 18 mortgage payments on July 21, 2006, as $2,327.21 coming out of Debtor Suspense and two separate transfers of $664.93 and $2,992.14 coming out of Trustee Suspense. These changes to the two suspense categories cause those balances to be different, but the collective amount held in suspense is not different on the histories. The principal balances reflected on both histories are the same. Finally, on August 31, 2007, the Moffitts made a payment of $319.19, but the Revised Payment History only reflects a payment of $317.84. Ms. Viers testified that the missing $1.35 was actually received and put in Debtor Suspense as a credit, but that it was not accounted for in the Revised Payment History (which was supposed to have been an accurate record of the Moffitts' mortgage payments and the application of those payments).

In addition to the Revised Payment History, ASC also provided the Moffitts' counsel with a communications record at some point prior to the Injunction Hearing. The communications record prepared by Ms. Viers is full of abbreviations and is unintelligible to a lay person not familiar with such records. Ms. Viers explained that a "D" indicates that an automated calling system called Davox initially makes the calls – that is, dials the mortgagor's phone number. If an answering machine or a person answers the telephone, the call is forwarded to an employee's phone line at ASC. Ms. Viers testified that there are

28

always two transactions for every call – one for the automated dialer and one for the employee.  If the line is dead once the representative gets it, it is assumed that the person answering the phone hung up, or that the connection was somehow lost.   On the communications record at issue, there were several notations that the mortgagor had hung up, but Ms. Viers could not say for sure whether the mortgagor in fact hung up, or whether the connection was lost.

Ms. Viers testified that calls are initiated when a payment is showing due.  For example, if a payment is due on the first of the month, a call may be made to remind the mortgagor that his or her payment is due, although a late fee will not be assessed until the grace period (as defined by the mortgage and note) has expired.   Based on the communications record and Ms. Viers' interpretation of its entries, eight calls were made to the Moffitts between August 21, 2007, and August 31, 2007.  Ms. Viers also testified that the purpose of the calls was to

> contact the mortgagor, basically what they consider a soft call, just to remind that we show that your account would be one payment past due.  That would give the opportunity for any discrepancy to be amended at that time.  That would also give to – late – if there was a need for a payment plan or a hardship that would need to be done, where that could be arranged at that phone call.

Ms. Viers also stated that no actual contact was made with the Moffitts through these phone calls.  One was answered, but the caller was told it was the wrong number.

On September 13, 2007, an entry on the call record states, "permanent call stop call, stop placed on the loan for DOSLIT."  Ms. Viers explained that the abbreviation "DOSLIT" stands for the Default Operation Services Litigation Department, and that the stop call entry

29

meant that no calls were supposed to be made to the Moffitts after that date.  However, on October 22, 2007, a call was made without a dialer and an answering machine picked up.

Ms. Viers testified that while ASC has a policy that no calls are to be made to a mortgagor if there is a call stop on the account, she learned that the call stop had been removed for the Moffitts' mortgage.  The removal of the call stop was not noted on the communications record, but Ms. Viers explained that the ASC representative would have been looking at a computer screen with a flag on it rather than the notes reflected on the call log.  Ms. Viers testified that she believed anyone with access to the servicing system could remove the stop call.  She also testified in response to questioning from the Court that the representatives are paid hourly, but that they must make so many contacts per hour and obtain so many promises to pay per hour in order to meet their guidelines and performance levels, and that the representative's performance evaluation is based on meeting certain criteria.

The communications record also indicates that a broker price opinion was ordered on August 22, 2007, and indicated a value of $31,500 for the Moffitts' home.  Ms. Viers testified that $95.00 of the $243.16 sitting in suspense (and referenced in ASC's August 14, 2007 letter) was ultimately applied to a broker's price opinion charge, and the remainder was applied to principal.  Ms. Viers testified that a broker price opinion is a drive-by inspection of the mortgaged property to make sure that someone is living there and to check the condition of the property and make sure there is no major damage to the home.  Ms. Viers explained that these price opinions are done when an account is 30 days delinquent.

The communications record shows that the Moffitts received eight calls in ten days. Given all the facts leading up to these calls, and specifically, the Moffitts' unsuccessful efforts to communicate with ASC during the summer of 2006, the Court finds Ms. Viers' testimony that the calls are the homeowner's opportunity to amend any discrepancy to be disingenuous. The Court finds the collection calls were for the sole purpose of obtaining payments, not to gather information, and that at the time they were made, the Moffitts were not behind in their payments.

### ASC's Proposed Remedy

Ms. Viers explained that once ASC learned of its mistake in not correctly applying the July 2006 mortgage payment, ASC was afraid to make any adjustments to the loan because it might bring about further "amended actions" and that they wanted to come to Court for the injunction hearing to get the Court's permission to make the necessary adjustments. ASC proposes to bring the Moffitts' mortgage account current by making certain reversals and adjustments to complete a payment of $319.25. ASC proposes to: reverse late fees assessed in 2006 of $13.30; reverse late fees assessed in 2005 of $40.65; reverse the $95.00 broker's price opinion charged in 2007; and advance $15.39. These amounts total $164.34. Ms. Viers also said some trustee money and some of the Moffitts' money was misapplied to principal, and that "reversals from principal curtailment" and certain fee reversals might be misunderstood.[15] If allowed to make these changes, Ms. Viers

---

[15]It is not clear how ASC intends to make up a full $319.25 payment, as Ms. Viers only listed $164.34 in other reversals and advancements.

testified that the Moffitts' February statement would show no late charges or fees, and they would just owe their February 2008 regular mortgage payment.

### The Moffitts' Emotional Distress

Mrs. Moffitt testified that when she got her bankruptcy discharge in March of 2006, she was elated to be out of bankruptcy after almost seven years, and to have made the extra $10,000 payment on her mortgage.  When she began to get the bi-monthly mortgage statements and late notices, she felt awful and would not answer the phone because she knew she had been making her payments on time.  Mrs. Moffitt testified that she had a complete nervous breakdown in December, explaining that she could not stand for anyone to talk to her or touch her, and had to have complete quiet around her.  She stated:

> It – these people took my money, did not apply it correctly.  It was money from my settlement where I was hit.  And they – they did not apply it correctly.  They would not apply it correctly.  They had the opportunity at anytime to take my home away from me, and that's all that went through my mind was I went through bankruptcy to hang onto this stupid house.

Mrs. Moffitt testified that she sought medical care for high blood pressure due to the stress caused by her mortgage troubles.  Her medication has been changed twice, and that she was given the medication Paxil for her nerves.  She takes two prescriptions for her high blood pressure, but it still spikes when she gets upset.  She stated that it is a "daily thing in my mind that tomorrow this might not be my home."  Mrs. Moffitt testified that she could not sleep at night, that she would get up and worry at 1 or 2 o'clock in the morning and go back over her records to make sure she had not missed a payment.  Mrs. Moffitt testified that she had to hire an attorney and reopen her bankruptcy because despite her numerous attempts, ASC

would not apply her payments correctly. She also testified that after she hired Mr. Hargis, she continued to get phone calls from ASC with requests that she call back that day, and that these phone calls felt harassing to her because they kept telling her she was a payment behind.

Mrs. Moffitt also explained that she understood that even if the injunction were granted, her lawsuit against ASC would not be over, but said that at least ASC would not be calling her constantly and telling her she owes "five hundred and something dollars this time and 319 the next time, and a different number the next time." She stated that while ASC had not called her since October 2007, she was still getting the statements "where I never know how much money they think I owe."

Mrs. Moffitt's husband, Donald, testified that his wife had suffered a lot of stress and worry over their mortgage dispute. He stated that his wife had "broke down" a few times because she could not get anyone to believe that she had made their mortgage payments, and that she had to increase her heart medication. He also stated that it made him feel angry, frustrated and wore out, and that he would not answer their phone any longer and probably never would.

The Court finds the Moffitts testimony in its entirety credible and accepts their testimony as fact. The Court finds Mrs. Moffitt suffered physical and emotional harm as a result of ASC's mishandling of her mortgage account, and Mr. Moffitt suffered emotional harm as well.

33

## ANALYSIS

Pursuant to Federal Rule of Civil Procedure 65, made applicable to bankruptcy proceedings by Rule 7065, and pursuant to 11 U.S.C. § 105, the Court may enter a preliminary injunction pending a trial on the merits. The Court must consider the following four factors for injunctive relief:

(1) whether the plaintiff is likely to prevail on the merits;

(2) whether the plaintiff has shown irreparable injury;

(3) the balance between the harm suffered by the plaintiff and the harm that would be inflected on other interested parties by the issuance of a preliminary injunction; and

(4) whether the public interest will be served by issuing a preliminary injunction.

*See United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir. 1998).

## Likelihood of Success on the Merits

"Likelihood of success on the merits requires that the movant find support for its position in governing law." *B & D Land and Livestock Co. v. Conner,* 534 F.Supp.2d 891, 906 (N.D. Iowa 2008). With respect to the requirement that the party seeking an injunction show that he or she is likely to succeed on the merits, the Eighth Circuit has stated:

> "[A]t the early stage of a preliminary injunction motion, the speculative nature of this particular ['likelihood of success'] inquiry militates against any wooden or mathematical application of the test. Instead, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir.1998) (internal citations and quotation marks omitted).

34

*B & D Land and Livestock Co.,* 534 F.Supp.2d at 906 (quoting *United Indus. Corp. v. Clorox Co.,* 140 F.3d at 1179).

The Moffitts' Complaint alleges that ASC violated RESPA by providing false statements in response to the Moffitts' Qualified Written Request.[16]   The Moffitts have proven RESPA violations by providing substantial evidence that ASC misapplied their payments and did not accurately respond to a Qualified Written Request.  RESPA requires one of three responses to a Qualified Written Request, as recently described by the Bankruptcy Court in Kansas:

> First, the servicer shall make the appropriate corrections and send the borrower a written notice of the correction. Second, if the servicer determines the account is not in error, the servicer must provide the borrower with a written response informing the borrower why the servicer believes the account is correct. Third, if the borrower requested information the servicer cannot provide, the servicer shall explain why the information is unavailable or cannot be obtained.

*In re Payne,* ___ B.R. ___, 2008 WL 1961489, *10 (Bankr. D. Kan. 2008) (citing 12 U.S.C. § 2605(e)(2)(A), (B), and (C)).  ASC responded to the Moffitts' Qualified Written Request in a timely manner, but its response was inadequate under RESPA.  ASC assumed its records were accurate, apparently without conducting any investigation whatsoever (as evidenced by the fact that Ms. Viers, who was assigned to the loan, did not discover ASC's failure to

---

[16]The Moffitts' Complaint also alleges that ASC violated the automatic stay under 11 U.S.C. § 362(a)(3) by misapplying funds paid to it by the Trustee pursuant to the Moffitts' confirmed plan, and by charging additional fees and late charges to be assessed on the Moffitts' account as a result of the misapplication of funds.  Because the Moffitts have shown that RESPA was violated, it is unnecessary for the Court to address the Moffitts' likelihood of success on this cause of action.

apply the Moffitts' July 2006 payment until the Moffitts filed their TRO Motion in December 2007), and simply sent the Moffitts a transaction history, copy of the mortgage, and a payoff letter. Accordingly, ASC made no corrections to the Moffitts' account, and did not inform the Moffitts why it believed the account was correct.

Moreover, the crux of the Moffitts' Complaint against ASC is that ASC misapplied payments, failed to correct its mistakes, and then repeatedly tried to collect payments from the Moffitts that were not owed. The evidence received at the Injunction Hearing supports these allegations.

It took ASC 113 days to apply the Moffitts' $10,000 payment to principal. During this 113 days, the Moffitts received six incorrect mortgage statements, made almost daily phone calls, and wrote three letters. As a result of ASC's failure to respond in any way to reliable information that the Moffitts' account was paid current (including receipt of the Trustee's final disbursement, a Court order, and the Moffitts' phone calls and letters), ASC continued to show the account past due and did not follow the Moffitts' instructions as to the application of their extra $10,000 payment. Instead, ASC applied the Moffitts' $10,000 payment to mortgage payments the Trustee's final disbursement was meant to pay, then misapplied the Trustee's final disbursement to future mortgage payments, fees, and suspense accounts, and finally, attempted to correct its mistakes by reversing the payments it had applied, applying $10,000 to principal, and reapplying the Trustee's final disbursement. However, in doing so, ASC made a mistake in how it reapplied those monies and lost a

36

portion of the Moffitts' July 2006 payment which caused the Moffitts to be a month behind according to ASC's records.

Having exhausted every avenue to obtain information (including making calls, writing letters, making a Qualified Written Request, and filing a lawsuit), the Moffitts still had no way of ascertaining why ASC sent them 18 statements showing them as being one month behind, and despite the Moffitts' efforts, ASC made no attempt to determine what was wrong with the Moffitts' mortgage and why the Moffitts contended they were current while ASC showed them as behind.  In fact, after the Moffitts' loan was assigned to Ms. Viers (just before the Moffitts sued ASC in February 2007), there was a six month delay before Ms. Viers began work on the file in August 2007, and it took another four months and the filing of the TRO Motion for Ms. Viers to recognize that the Moffitts were current on their mortgage payments and that ASC had made a mistake in not applying the Moffitts' July 2006 payment.  Ms. Viers testified that the Moffitts *should* have provided ASC with proof of payment.  Yet, the Moffitts had no way of knowing that ASC *needed* proof of payment – they had received statements showing their payments had been received, and in particular, statement 6 showing their July 2006 payment was received and applied.  The Moffitts had no way of knowing, based on the statements they received, that the July 2006 mortgage payment had been reversed and placed in "suspense."

While ASC made automated collection calls, it made no effort to determine why a sum of money had been sitting in "suspense" (both Debtor and Trustee suspense according to the Revised Payment History) for over a year (since July 2006); yet, ASC (and Ms. Viers

37

specifically) did not even look for a possible mistake made by ASC even though the mistake should not have been that hard to find. ASC had all the information it needed to find this mistake when it prepared the Initial Payment History as a response to the Moffitts' Qualified Written Request. All ASC needed to do was examine the reversals and reapplications (as the Court did), and it would have discovered that it overcharged the Moffitts for 14 mortgage payments. However, ASC did not do this.

ASC's failure to keep accurate records forced the Moffitts to hire counsel, go back into bankruptcy, file a Qualified Written Request under the Real Estate Settlement Procedures Act, file a lawsuit, and file for a TRO to protect themselves. Although ASC attempted to correct some of its numerous mistakes, it did not provide the Moffitts information from which the Moffitts could ascertain the status of their account, the accuracy of the statements they received, or the amount owed on their loan. Additionally, ASC did not correct its mistakes, even in response to a Qualified Written Request, but continued to attempt to collect an additional payment that was not owed, as well as late fees, by sending inaccurate statements and calling the Moffitts' home.

In conclusion, ASC did not accurately apply the payments it received from the Moffitts or the Trustee, did not accurately process information vital to the servicing of the Moffitts' loan, did not send the Moffitts accurate mortgage statements, did not provide an accurate payment history, and did not discover the mistakes it made, yet continued to attempt to collect payments from the Moffitts that were not owed. The evidence supports the premise that ASC's servicing procedures, as exemplified by the Moffitts' account, are not organized

38

to ensure accuracy and accountability.  For these reasons, the Court finds that the Moffitts are likely to prevail on the merits of their case.

### Irreparable Injury

The Court finds the Moffitts would suffer irreparable injury if a temporary injunction were not granted.  The Moffitts attempted to call ASC and wrote ASC following the misapplication of their $10,000 principal payment in 2006, and even after the $10,000 payment was properly applied, the Moffitts attempted to discern why they began to get two statements per month showing that they were still in bankruptcy, and that they were behind in payments. Frustrated with their inability to communicate with ASC, the Moffitts reopened their bankruptcy case in July 31, 2006, filed a Qualified Written Request in the Fall of 2006, and ultimately filed this adversary proceeding against ASC in February 2007.  Despite the fact that the Moffitts reopened their bankruptcy case and filed a complaint against ASC, and were represented by counsel, ASC began making collection calls to the Moffitts in August 2007 and continued through October 2007, even though a "stop call" had been placed on the Moffitts' account.  Furthermore, counsel for ASC explained that ASC would not agree to a temporary injunction because it could not guarantee that it would not violate the injunction. In other words, ASC's counsel explained that ASC could not be responsible for its own actions.

The Moffitts' testimony provided uncontroverted proof that they were already irreparably harmed even before the Injunction Hearing. Mrs. Moffitt testified that she suffered extreme stress and high blood pressure due to the problems associated with her

39

mortgage. Her sense of well-being has been materially eroded. Mr. Moffitt testified he may never answer the phone again. Given the evidence of ASC's extraordinary incompetence, it is relatively easy for the Court to find that the Moffitts would suffer irreparable injury if ASC's actions were not enjoined.

### Balance of Harm

The Moffitts have already suffered substantial harm as a result of ASC's actions, whereas ASC should suffer no harm due to the preliminary injunction which only requires that ASC not contact the Moffitts until this matter is resolved.

### Public Interest

In this case, a mortgage servicing institution ignored communication from, and refused to provide accurate information to, a couple about their home mortgage. A public interest is served when citizens who have exhausted all other avenues for help come to a court seeking immediate relief from unfair and callous treatment, and are promptly given their day in court, and granted the relief they seek.

### CONCLUSION

This is a long detailed opinion about what should have been a relatively simple prepayment on a mortgage. The Moffitts made an additional $10,000 payment to be applied to principal, and this one unusual transaction caused the Moffitts' mortgage to go into complete disarray. The Moffitts received their discharge and their bankruptcy case was closed. ASC provided the Trustee with a final payoff to bring the Moffitts current, and that payment was made. ASC, however, recorded the $10,000 payment first, misapplied it, and

then while correcting the misapplication of the $10,000 principal payment and the Trustee's final payments, ASC incorrectly applied 14 mortgage payments. This misapplication of payments caused a portion of the Moffitts' July 2006 payment to be used for a shortage, leaving a balance that was insufficient to make a full payment for that month. ASC did not find this mistake and continued to show the Moffitts one month behind until the Injunction Hearing. ASC never questioned why it had extra money in a suspense account – ASC never attempted to understand what the problem was until the TRO Motion was filed. The Moffitts acted honorably in trying to secure their home – they made the extra $10,000 payment on principal and continued to make full and timely monthly mortgage payments despite ASC continually showing them one month behind, and despite the bi-monthly inaccurate, incomprehensible mortgage statements they received from ASC. Clearly, a preliminary injunction was necessary to prevent ASC from continuing its efforts to collect payments from the Moffitts which they did not owe. The Moffitts have shown all the factors necessary for the entry of a preliminary injunction. Trial in this matter will be set by subsequent notice.

_Audrey R Evans_

_____
HONORABLE AUDREY R. EVANS
U. S. BANKRUPTCY JUDGE

Date: June 18, 2008

cc:   Debra J. Reece, Attorney for Plaintiffs
      Joel G. Hargis, Attorney for Plaintiffs
      Blair B. Evans, Attorney for Defendant
      Defendant
      Plaintiffs/Debtors
      Trustee
      U.S. Trustee

## Appendix A

## Moffitts' Payment History

| Check No. | Date Payment Cleared | Month/Year Payment Due | Amount |
|---|---|---|---|
| 2604 | April 5, 2006 | Principal Payment Only | $10,000 |
| 2606 | April 5, 2006 | April 2006 | $332.46 |
| 2616 | May 5, 2006 | May 2006 | $332.46 |
| 2502 | June 2, 2006 | June 2006 | $332.46 |
| 2518 | July 3, 2006 | July 2006 | $332.46 |
| 2525 | August 2, 2006 | August 2006 | $332.46 |
| 2660 | August 30, 2006 | September 2006 | $319.19 |
| Online payment | September 28, 2006 | October 2006 | $319.19 |
| Online payment | October 24, 2006 | November 2006 | $319.19 |
| Online payment | November 22, 2006 | December 2006 | $319.19 |
| Online payment | December 27, 2006 | January 2007 | $319.19 |
| Online payment | January 24, 2007 | February 2007 | $319.19 |
| Online payment | February 23, 2007 | March 2007 | $319.19 |
| Online payment | March 29, 2007 | April 2007 | $319.19 |
| Online payment | April 24, 2007 | May 2007 | $319.19 |
| Online payment | May 29, 2007 | June 2007 | $319.19 |
| Online payment | June 29, 2007 | July 2007 | $319.19 |
| Online payment | July 31, 2007 | August 2007 | $319.19 |
| Online payment | August 31, 2007 | September 2007 | $319.19 |
| Online payment | September 28, 2007 | October 2007 | $319.19 |
| Online payment | November 2, 2007 | November 2007 | $319.25 |
| Online payment | December 4, 2007 | December 2007 | $319.25 |
| Online payment | January 4, 2007 | January 2008 | $319.25 |

**Appendix B**

**<u>Examples of Mortgage Statements</u>**

**ASC**
AMERICA'S SERVICING COMPANY

Return Mail Operations
America's Servicing Company
P.O. Box 10388
Des Moines, IA 50306-0388

Informational Mortgage Statement

**Customer Service**
8am - 11pm M-Th (EST)
8am - 10pm F (EST)
9am - 3pm Sat (EST)
*Phone number*
(888) 828-2377

*Fax number*
(866) 453-6315

*Loan number*
1172006772

*Regular mail*
1 Home Campus
MAC # X2501-01Z
Des Moines, IA 50328-0001

*Correspondence*
PO Box 10328
Des Moines, IA 50306-0328

## For Informational Purposes

#BWNGKLH
#106XXPJFVXZJF047#

000396

DONALD EDWARD MOFFITT
220 CENTRAL
BAY AR 72411-9461

**Home loan facts**

*Property address*
220 CENTRAL
BAY AR 72411

Principal balance as of 04/03/06
$28,795.67
This is your principal balance only. For your pay off balance, please call Customer Service.

## Next Payment 05/01/06

| | |
|---|---|
| Payment | $332.46 |
| Other payment(s) | $ .00 |
| Late charges | $ .00 |
| Other charges | $ .00 |
| **Total payment** | **$332.46** |

*Interest rate*
9.000%
*Interest paid - year to date*
$4,227.78
*Escrow balance - year to date*
$3,336.77
*Taxes paid - year to date*
$ .00



### Important Messages
*This statement is for informational purposes only. Our records indicate that your loan is protected by a bankruptcy plan. The attached coupon reflects the calendar due date, not the contractual due date of the bankruptcy plan. If you have any questions regarding your loan, please contact your bankruptcy attorney or our office.*

pd 4/27/06

### Activity Since Your Last Statement

| Date | Description | Total | Principal | Interest | Escrow | Late charge | Misc |
|---|---|---|---|---|---|---|---|
| 04/03 | PRINCIPAL PMT | $418.43 | | | | | |
| 04/03 | PAYMENT | $332.46 | | | | SUSPENSE | $418.43 |
| 04/03 | PAYMENT | $332.46 | $47.51 | $219.46 | $65.49 | | |
| 04/03 | PAYMENT | $332.46 | $47.15 | $219.82 | $65.49 | | |
| | | $782.28 | | | | | |

This statement is for informational purposes only and is being provided as a courtesy should you voluntarily decide to make your loan payments. This statement should not be construed as an attempt to collect a debt or a demand for payment contrary to any protections you may have received pursuant to your bankruptcy case.

If you have received a discharge, and the loan was not reaffirmed in the bankruptcy case, we will only exercise our rights as against the property and we are not attempting any act to collect the discharged debt from you personally.

(Keep upper portion for your records.)

**PLAINTIFF'S EXHIBIT 5**

**ASC**
AMERICA'S SERVICING COMPANY

Return Mail Operations
mortgageaccountonline.com
P.O. Box 10388
Des Moines, IA 50306-0388

**Monthly Mortgage Statement**

Customer Service
M-F 8am - 9pm (EST)
Sat 9am - 1pm (EST)

*Statement Date*
12/17/07
*Loan Number*
1172006772

*Phone*
888-828-2377

*Fax*
866-453-6315

*Online*
mortgageaccountonline.com

*Regular mail payments*
P.O. Box 1820
Newark, NJ 07101-1820

*Correspondence*
PO Box 10328
Des Moines, IA 50306-0328

#BWNGKLH
#106XXPJFVXZJF120#        029 010782

DONALD EDWARD MOFFITT
220 CENTRAL
BAY  AR  72411-9461

*Property address*
220 CENTRAL
BAY AR 72411

*Principal balance as of 12/17/07*
$15,111.37

Contact Customer Service
for your payoff balance.

*Interest rate*
9.000%

*Interest paid - year-to-date*
$1,329.31

*Taxes paid - year-to-date*
$22.46

*Escrow balance*
$143.08

## Important Messages
*Your monthly mortgage payment
has not been received.  Please
make your payment immediately.
If you have questions about your
account or are unable to send
your payment, please contact
one of our loan counselors at
888-828-2377*

| | |
|---|---|
| Payment (Principal and/or Interest, Escrow) | $319.25 |
| Optional Product(s)* | $ .00 |
| Current Monthly Payment 01/01/08 | $319.25 |
| Overdue Payment(s) 12/01/07 | $319.25 |
| Unpaid Late Charge(s) | $12.77 |
| Other Charges | $ .00 |
| **Total Payment Due  01/01/08** | **$651.27** |

### Activity Since Your Last Statement

| Date | Description | Total | Principal | Interest | Escrow | Late charge | Misc |
|---|---|---|---|---|---|---|---|
| 12/17 | LATE FEE | | | | | $12.77- | |

Late charges are assessed after the close of business on the assessment date and only after all
payments received have been applied.

(Keep upper portion for your records.)                    10359MB0

---

**Please Include This Portion With Your Payment**

**ASC**
AMERICA'S SERVICING COMPANY

DONALD EDWARD MOFFITT
220 CENTRAL
BAY  AR  72411

Total Payment Due 01/01/08        $651.27
After 01/16/08 Add Late Fee        $12.77
Total Amount Due After 01/16/08:   $664.04

☐ Please check this
box if changes are
indicated on the
reverse side.

106 Loan Number: 1172006772

Customer Service:  888-828-2377



AMERICA'S SERVICING COMPANY
PO BOX 1820
NEWARK NJ 07101-1820

Please specify additional
funds. Any additional
funds not specified will be
applied first to any
outstanding charges.

Monthly Payment
_____ x pmt amt        $ ☐☐☐☐☐☐

Late Charges        $ ☐☐☐☐☐☐

Additional Principal        $ ☐☐☐☐☐☐

Additional Escrow        $ ☐☐☐☐☐☐

Other Charges        $ ☐☐☐☐☐☐

Total Amount Enclosed $ ☐☐☐☐☐☐
(PLEASE DO NOT SEND CASH)

106 1172006772 9 10 00 00031925 00033202 00065127 00063850 5

## Appendix C

## <u>Tables Representing Mortgage Statements</u>

The "principal balance as of date" and principal balance are reflected in the upper left hand corner of each table.  The majority of the statements provide in bold "Next Payment" followed by a date.  The statements then list payment, other payments, late charges, and other charges.  This information is reflected in the shaded upper right hand corner of each table. When all the statements are analyzed in sequence, it is clear that the word "payment" meant "payment due", but most of the statements do not actually say a payment is due; the Court infers that the reason the statements do not say "payment due" is that these statements were incorrectly showing the Moffitts to be in bankruptcy such that a trustee would be making the payment, and not the mortagor.

The statements also include an area showing "activity since your last statement" which is reflected on the bottom portion of each table.  The information there is taken directly off the statements – if something seems to be missing such as a total under the column named "total," that is because it was blank on the statement.  Also, the word "suspense" often appears in the late charge column but based on Ms. Viers' testimony, that probably refers to where a payment came from or went to.

| No. | Principal Balance as of date | Principal Balance | | Next Payment    05/01/06 | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 04/03/06 | $28,795.67 | | Payment | | | | $332.46 |
| Activity Since Last Statement | | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |

| No. | Principal Balance as of date | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|---|---|---|---|---|---|---|---|---|---|
| Activity Since Last Statement | | 04/03 | PRINCIPAL PMT | | $418.43 | | | SUSPENSE | $418.43– |
| | | 04/03 | PAYMENT | $332.46 | $47.51 | $219.46 | $65.49 | | |
| | | 04/03 | PAYMENT | $332.46 | $47.15 | $219.82 | $65.49 | | |
| | | 04/03 | PAYMENT | $782.28 | | | | | |

| No. | Principal Balance as of date | Principal Balance | | Next Payment    08/01/06 | | | | |
|---|---|---|---|---|---|---|---|---|
| 2 | 04/26/06 | $28,641.52 | | Payment | | | | $332.46 |

| | | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|---|---|---|---|---|---|---|---|---|---|
| Activity Since Last Statement | | 04/26 | PAYMENT | $8,535.79 | | | | SUSPENSE | $8,535.79 |
| | | 04/26 | PAYMENT | | $51.77 | $215.20 | $65.49 | | |
| | | 04/26 | PAYMENT | | $51.38 | $215.59 | $65.49 | | |
| | | 04/26 | PAYMENT | $1,045.78 | $51.00 | $215.97 | $64.59 | SUSPENSE | $48.40 |

| No. | Principal Balance as of date | Principal Balance | | Next Payment    09/01/06 | | | | |
|---|---|---|---|---|---|---|---|---|
| 3 | 05/03/06 | $28,589.36 | | Payment | | | | $332.46 |

| | | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|---|---|---|---|---|---|---|---|---|---|
| Activity Since Last Statement | | 05/03 | PAYMENT | $332.46 | $52.16 | $214.81 | $65.49 | | |

| No. | Principal Balance as of date | Principal Balance | | | | | | Next Payment    11/01/06 | |
|---|---|---|---|---|---|---|---|---|---|
| 4 | 05/16/06 | $28,483.87 | | | | | | Payment | $332.46 |
| Activity Since Last Statement | | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
| | | 05/16 | PAYMENT | | $52.94 | $214.03 | $65.49 | | |
| | | 05/16 | PAYMENT | | $52.55 | $214.42 | $78.13 | SUSPENSE | -677.56 |

| No. | Principal Balance as of date | Principal Balance | | | | | | Next Payment    09/01/07 | |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 05/31/06 | $27,932.09 | | | | | | Payment | $332.46 |
| Activity Since Last Statement | | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
| | | 05/31 | PAYMENT | | $57.05 | $209.92 | $65.49 | | |
| | | 05/31 | PAYMENT | | $56.63 | $210.34 | $65.49 | | |
| | | 05/31 | PAYMENT | | $56.21 | $210.76 | $65.49 | | |
| | | 05/31 | PAYMENT | | $55.79 | $211.18 | $65.49 | | |

| No. | Principal Balance as of date | Principal Balance | | | | | | Next Payment    07/01/06 | |
|---|---|---|---|---|---|---|---|---|---|
| 6 | 06/30/06 | $29,890.76 | | | | | | Payment | $332.46 |
| | | | | | | | | Other Payment(s) | $5,651.82 |
| | | | | | | | | **Total Payment** | **$5,984.28** |
| Activity Since Last Statement | | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
| | | 06/30 | PAYMENT | $332.46 | $42.47 | $224.50 | $65.49 | | |
| | | 06/26 | PMT REVERSAL | | $42.47- | $224.50- | $58.91- | SUSPENSE | $325.88 |
| | | 06/26 | PMT REVERSAL | | $42.79- | $224.18- | $58.91- | SUSPENSE | $325.88 |
| | | 06/26 | PMT REVERSAL | | $43.11- | $223.86- | $58.91- | SUSPENSE | $325.88 |

| No. | Principal Balance as of date | Principal Balance | | Next Payment   08/01/06 | |
|---|---|---|---|---|---|
| **7** | 07/21/06 | $17,678.44 | | Payment | $332.46 |
| | | | | Other Payment(s) | $332.46 |
| | | | | **Total payment** | **$664.92** |

| Activity Since Last Statement | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|---|---|---|---|---|---|---|---|---|
| | 07/21 | PAYMENT | | $133.38 | $133.59 | $65.49 | | |
| | 07/21 | PAYMENT | | $132.39 | $134.58 | $65.49 | | |
| | 07/21 | PAYMENT | | $131.40 | $135.57 | $65.49 | | |
| | 07/21 | PAYMENT | | $130.42 | $136.55 | $65.49 | | |

| No. | Principal Balance as of date | Principal Balance | | Next Payment   08/01/06 | |
|---|---|---|---|---|---|
| **8** | 07/31/06 | $17,544.06 | | Payment | $332.46 |

| Activity Since Last Statement | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|---|---|---|---|---|---|---|---|---|
| | 07/31 | PAYMENT | $332.46 | $134.38 | $132.59 | $65.49 | | |
| | 07/25 | LATE CHARGE ADJ | | | | | $13.04 | |
| | 07/24 | ESCROW REFUND | $3,011.87- | | | $3,011.87- | | |
| | 07/24 | PMT REVERSAL | | | | | $13.04- SUSPENSE | $13.04 |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    09/01/06 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9 | 08/16/06 | $17,544.06 | | | | Payment | | | | $319.19 |
| | | | | | | Other Payment(s) | | | | $332.46 |
| | | | | | | Late Charges | | | | $13.30 |
| | | | | | | **Total payment** | | | | **$664.95** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | | *Misc.* |
| | | 08/16 | LATE FEE | | | | | $13.30- | | |
| | | 08/09 | FLOOD INS PMT | $241.00- | | | $241.00- | | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    10/01/06 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 09/18/06 | $17,408.67 | | | | Payment | | | | $319.19 |
| | | | | | | Other Payment(s) | | | | $319.19 |
| | | | | | | Late Charges | | | | $12.77 |
| | | | | | | **Total payment** | | | | **$651.15** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | | *Misc.* |
| | | 09/18 | LATE FEE | | | | | $12.77- | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    10/01/06 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 09/22/06 | $17,272.27 | | | | Payment | | | | $319.19 |
| | | | | | | Other Payment(s) | | | | $  .00 |
| | | | | | | Late Charges | | | | $12.77 |
| | | | | | | **Total payment** | | | | **$331.96** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | | *Misc.* |
| | | 09/22 | PAYMENT | $319.19 | $136.40 | $130.57 | $52.22 | | | |

| No. | Principal Balance as of date | Principal Balance | Next Payment    11/01/06 | | |
|-----|------|------|------|---|---|
| **12** | 10/16/06 | $17,272.27 | Payment | | $319.19 |
| | | | Other Payment(s) | | $319.19 |
| | | | Late Charges | | $25.54 |
| | | | **Total payment** | | **$663.92** |

| Activity Since Last Statement | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|------|------|------|------|------|------|------|------|------|
| | 10/16 | LATE FEE | | | | | $12.77- | |
| | 10/11 | HAZARD INS PMT | $44.00- | | | $44.00- | | |
| | 10/04 | HAZARD INS PMT | $301.00- | | | $301.00- | | |

| No. | Principal Balance as of date | Principal Balance | Next Payment    11/01/06 | | |
|-----|------|------|------|---|---|
| **13** | 10/23/06 | $17,134.84 | Payment | | $319.19 |
| | | | Other Payment(s) | | $  .00 |
| | | | Late Charges | | $25.54 |
| | | | **Total payment** | | **$344.73** |

| Activity Since Last Statement | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|------|------|------|------|------|------|------|------|------|
| | 10/23 | PAYMENT | $319.19 | $137.43 | $129.54 | $52.22 | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    12/01/06 | | | |
|-----|------------------------------|-------------------|---|---|---|--------------------------|---|---|---|
| 14 | 11/16/06 | $17,134.84 | | | | Payment | | | $319.19 |
| | | | | | | Other Payment(s) | | | $319.19 |
| | | | | | | Late Charges | | | $38.31 |
| | | | | | | **Total payment** | | | **$676.69** |
| **Activity Since Last Statement** | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | 11/16 | LATE FEE | | | | | $12.77- | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    12/01/06 | | | |
|-----|------------------------------|-------------------|---|---|---|--------------------------|---|---|---|
| 15 | 11/21/06 | $16,996.38 | | | | Payment | | | $319.19 |
| | | | | | | Other Payment(s) | | | $  .00 |
| | | | | | | Late Charges | | | $38.31 |
| | | | | | | **Total payment** | | | **$357.50** |
| **Activity Since Last Statement** | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | 11/21 | PAYMENT | $319.19 | $138.46 | $128.51 | $52.22 | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    01/01/07 | | | |
|-----|------------------------------|-------------------|---|---|---|--------------------------|---|---|---|
| 16 | 12/18/06 | $16,996.38 | | | | Payment | | | $319.19 |
| | | | | | | Other Payment(s) | | | $319.19 |
| | | | | | | Late Charges | | | $12.77 |
| | | | | | | **Total payment** | | | **$651.15** |
| **Activity Since Last Statement** | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | 12/18 | LATE FEE | | | | | $12.77- | |
| | 12/06 | LATE FEE ADJ | | | | | $38.31 | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   01/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 17 | 12/26/06 | $16,856.88 | | | | Payment | | | $319.19 |
| | | | | | | Other Payment(s) | | | $  .00 |
| | | | | | | Late Charges | | | $12.77 |
| | | | | | | **Total payment** | | | **$331.96** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 12/26 | PAYMENT | $319.19 | $139.50 | $127.47 | $52.22 | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   02/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 18 | 01/16/07 | $16,856.88 | | | | Payment | | | $319.19 |
| | | | | | | Other Payment(s) | | | $319.19 |
| | | | | | | Late Charges | | | $25.54 |
| | | | | | | **Total payment** | | | **$663.92** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 01/16 | LATE FEE | | | | | $12.77- | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   02/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 19 | 01/23/07 | $16,716.34 | | | | Payment | | | $319.19 |
| | | | | | | Other Payment(s) | | | $  .00 |
| | | | | | | Late Charges | | | $25.54 |
| | | | | | | **Total payment** | | | **$344.73** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 01/23 | PAYMENT | $319.19 | $140.54 | $126.43 | $52.22 | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    03/01/07 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 20 | 02/16/07 | $16,716.34 | | | | Payment | | | | $319.19 |
| | | | | | | Other Payment(s) | | | | $319.19 |
| | | | | | | Late Charges | | | | $38.31 |
| | | | | | | **Total payment** | | | | **$676.69** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* | |
| | | 02/16 | LATE FEE | | | | | $12.77- | | |
| | | 02/15 | PAYMENT | $1.32 | | | | SUSPENSE | $1.32 | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    03/01/07 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 21 | 02/22/07 | $16,574.74 | | | | Payment | | | | $319.19 |
| | | | | | | Other Payment(s) | | | | $  .00 |
| | | | | | | Late Charges | | | | $38.31 |
| | | | | | | **Total payment** | | | | **$357.50** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* | |
| | | 02/22 | PAYMENT | $319.19 | $141.60 | $125.37 | $52.22 | | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment    04/01/07 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 22 | 03/16/07 | $16,574.74 | | | | Payment | | | | $317.84 |
| | | | | | | Other Payment(s) | | | | $319.19 |
| | | | | | | Late Charges | | | | $51.08 |
| | | | | | | **Total payment** | | | | **$688.11** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* | |
| | | 03/16 | LATE FEE | | | | | $12.77- | | |
| | | 03/14 | MISC INS PMT | $63.00- | | | $63.00- | | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   04/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 23 | 03/28/07 | $16,432.08 | | | | Payment | | | $317.84 |
| | | | | | | Other Payment(s) | | | $  .00 |
| | | | | | | Late Charges | | | $51.08 |
| | | | | | | **Total payment** | | | **$368.92** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 03/28 | PAYMENT | $319.19 | $142.66 | $124.31 | $52.22 | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   05/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 24 | 04/16/07 | $16,432.08 | | | | Payment | | | $317.84 |
| | | | | | | Other Payment(s) | | | $317.84 |
| | | | | | | Late Charges | | | $63.79 |
| | | | | | | **Total payment** | | | **$699.47** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 04/16 | LATE FEE | | | | | $12.71- | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   05/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 25 | 04/23/07 | $16,288.35 | | | | Payment | | | $317.84 |
| | | | | | | Other Payment(s) | | | $  .00 |
| | | | | | | Late Charges | | | $62.44 |
| | | | | | | **Total payment** | | | **$380.28** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 04/23 | PAYMENT | $319.19 | $143.73 | $123.24 | $50.87 | $1.35 | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   06/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 26 | 05/16/07 | $16,288.35 | | | | Payment | | | $317.84 |
| | | | | | | Other Payment(s) | | | $317.84 |
| | | | | | | Late Charges | | | $75.15 |
| | | | | | | **Total payment** | | | **$710.83** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 05/16 | LATE FEE | | | | | $12.71- | |
| | | 05/02 | COUNTY TAX PMT | $22.46- | | | $22.46- | | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   06/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 27 | 05/29/07 | $16,143.54 | | | | Payment | | | $317.84 |
| | | | | | | Other Payment(s) | | | $  .00 |
| | | | | | | Late Charges | | | $73.80 |
| | | | | | | **Total payment** | | | **$391.64** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 05/29 | PAYMENT | $319.19 | $144.81 | $122.16 | $50.87 | $1.35 | |

| No. | Principal Balance as of date | Principal Balance | | | | Next Payment   07/01/07 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 28 | 06/18/07 | $16,143.54 | | | | Payment | | | $317.84 |
| | | | | | | Other Payment(s) | | | $317.84 |
| | | | | | | Late Charges | | | $86.51 |
| | | | | | | **Total payment** | | | **$722.19** |
| **Activity Since Last Statement** | | *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| | | 06/18 | LATE FEE | | | | | $12.71- | |

| No. | Principal Balance as of date | Principal Balance | Next Payment   07/01/07 | |
|---|---|---|---|---|
| 29 | 06/29/07 | $15,997.65 | Payment | $317.84 |
| | | | Other Payment(s) | $  .00 |
| | | | Late Charges | $85.16 |
| | | | **Total payment** | **$403.00** |

| Activity Since Last Statement | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|---|---|---|---|---|---|---|---|---|
| | 06/29 | PAYMENT | $319.19 | $145.89 | $121.08 | $50.87 | $1.35 | |

| No. | Principal Balance as of date | Principal Balance | Next Payment   08/01/07 | |
|---|---|---|---|---|
| 30 | 07/16/07 | $15,997.65 | Payment | $317.84 |
| | | | Other Payment(s) | $317.84 |
| | | | Late Charges | $97.87 |
| | | | **Total payment** | **$733.55** |

| Activity Since Last Statement | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|---|---|---|---|---|---|---|---|---|
| | 07/16 | LATE FEE | | | | | $12.71- | |

| No. | Principal Balance as of date | Principal Balance | Next Payment   08/01/07 | |
|---|---|---|---|---|
| 31 | 08/01/07 | $15,850.66 | Payment | $317.84 |
| | | | Other Payment(s) | $  .00 |
| | | | Late Charges | $97.87 |
| | | | **Total payment** | **$415.71** |

| Activity Since Last Statement | Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|---|---|---|---|---|---|---|---|---|
| | 08/01 | PAYMENT | | $146.99 | $119.98 | $50.87 | SUSPENSE | $317.84- |
| | 07/31 | PAYMENT | $319.19 | | | | SUSPENSE | $319.19 |

| No. | Principal Balance as of date | Principal Balance | Current Monthly Payment (Principal and/or Interest, Escrow) | | | | | $317.84 |
|-----|------------------------------|-------------------|--------------------------------------------------------------|--|--|--|--|---------|
| **32** | 08/31/07 | $15,702.57 | Overdue Payment(s) | | | | | $ .00 |
| | | | Unpaid Late Charge(s) | | | | | $  .00 |
| | | | **Total Payment Due 09/01/07** | | | | | **$317.84** |

**Activity Since Your Last Statement**

| Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|------|-------------|-------|-----------|----------|--------|-------------|-------|
| 08/31 | PAYMENT | $1.35 | | | | SUSPENSE | $1.35 |
| 08/31 | PAYMENT | $317.84 | $148.09 | $118.88 | $50.87 | | |
| 08/14 | LATE CHARGE ADJ | | | | | $97.87 | |
| 08/09 | FLOOD INS PMT | $286.00- | | | $286.00- | | |

| No. | Principal Balance as of date | Principal Balance | Current Monthly Payment    10/01/07 (Principal and/or Interest, Escrow) | | | | | $319.25 |
|-----|------------------------------|-------------------|--------------------------------------------------------------------------|--|--|--|--|---------|
| **33** | 09/17/07 | $15,702.57 | Overdue Payment(s) **09/01/07** | | | | | $317.84 |
| | | | Unpaid Late Charge(s) | | | | | $12.71 |
| | | | **Total Payment Due    10/01/07** | | | | | **$649.80** |

**Activity Since Your Last Statement**

| Date | Description | Total | Principal | Interest | Escrow | Late Charge | Misc. |
|------|-------------|-------|-----------|----------|--------|-------------|-------|
| 09/17 | LATE FEE | | | | | $12.71- | |
| 09/17 | HAZARD INS RFD | $32.00 | | | $32.00 | | |

| No. | Principal Balance as of date | Principal Balance | Current Monthly Payment        10/01/07 (Principal and/or Interest, Escrow) | | | | $319.25 |
|-----|------------------------------|-------------------|----|----|----|----|-----|
| **34** | 09/28/07 | $15,553.37 | Overdue Payment(s) | | | | $ .00 |
| | | | Unpaid Late Charge(s) | | | | $11.36 |
| | | | **Total Payment Due    10/01/07** | | | | **$330.61** |
| **Activity Since Your Last Statement** | | | | | | | |
| *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| 09/28 | PAYMENT | $319.19 | $149.20 | $117.77 | $50.87 | $1.35 | |
| 09/19 | HAZARD INS PMT | $301.00- | | | $301.00- | | |

| No. | Principal Balance as of date | Principal Balance | Current Monthly Payment  11/01/07 (Principal and/or Interest, Escrow) | | | | $319.25 |
|-----|------------------------------|-------------------|----|----|----|----|-----|
| **35** | 10/16/07 | $15,415.22 | Overdue Payment(s)        **10/01/07** | | | | $319.25 |
| | | | Unpaid Late Charge(s) | | | | $12.77 |
| | | | **Total Payment Due    11/01/07** | | | | **$651.27** |
| **Activity Since Your Last Statement** | | | | | | | |
| *Date* | *Description* | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| 10/16 | LATE FEE | | | | | $12.77- | |
| 10/16 | PRINCIPAL PMT | | $138.15 | | | SUSPENSE | $138.15- |
| 10/16 | PAYMENT | | | | | SUSPENSE | $95.00- |
| 10/16 | PAYMENT | | | | | $11.36 SUSPENSE | $11.36- |

| No. | Principal Balance as of date | Principal Balance | Current Monthly Payment  12/01/07 (Principal and/or Interest, Escrow) | | | | | $319.25 |
|---|---|---|---|---|---|---|---|---|
| **36** | 11/16/07 | $15,263.86 | Overdue Payment(s)            **11/01/07** | | | | | $319.25 |
| | | | Unpaid Late Charge(s) | | | | | $25.54 |
| | | | **Total Payment Due    12/01/07** | | | | | **$664.04** |
| **Activity Since Your Last Statement** | | | | | | | | |
| *Date* | *Description* | | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| 11/16 | LATE FEE | | | | | | $12.77- | |

| No. | Principal Balance as of date | Principal Balance | Current Monthly Payment  12/01/07 (Principal and/or Interest, Escrow) | | | | | $319.25 |
|---|---|---|---|---|---|---|---|---|
| **37** | 12/04/07 | $15,111.37 | Overdue Payment(s)            **12/01/07** | | | | | $319.25 |
| | | | Unpaid Late Charge(s) | | | | | $ .00 |
| | | | **Total Payment Due    12/01/07** | | | | | **$638.50** |
| **Activity Since Your Last Statement** | | | | | | | | |
| *Date* | *Description* | | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| 12/04 | PAYMENT | | $319.25 | $152.49 | $114.48 | $52.28 | | |
| 11/20 | LATE CHARGE ADJ | | | | | | $25.54 | |

| No. | Principal Balance as of date | Principal Balance | Current Monthly Payment  01/01/08 (Principal and/or Interest, Escrow) | | | | | $319.25 |
|---|---|---|---|---|---|---|---|---|
| **38** | 12/17/07 | $15,111.37 | Overdue Payment(s)            **12/01/07** | | | | | $319.25 |
| | | | Unpaid Late Charge(s) | | | | | $12.77 |
| | | | **Total Payment Due    01/01/08** | | | | | **$651.27** |
| **Activity Since Your Last Statement** | | | | | | | | |
| *Date* | *Description* | | *Total* | *Principal* | *Interest* | *Escrow* | *Late Charge* | *Misc.* |
| 12/17 | LATE FEE | | | | | | $12.77- | |